## FRANK OLIVER v. STATE.

No. A-10017.   Oct. 21, 1942.

(130 P. 2d 321.)

D. D. Archer, Fred M. Black, and C. C. Andrews, all of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and J. Walker Field, Asst. Atty. Gen., for defendant in error.

BAREFOOT, P. J.   Defendant, Frank Oliver, was charged in the court of common pleas of Oklahoma county with the crime of securing credit fraudulently; was tried, convicted, and sentenced to pay a fine of $75, and has appealed.

It is contended, first, A, "That there is a material variance between the allegations of the information and the proof at the trial", and, B, "That it is the defendant's theory that the statute under which the defendant was prosecuted was unconstitutional insofar as it relates to loans of money, or the borrowing of money is concerned, for the reason that no mention is made in the title of the act in respect to the loan of money or the borrowing

of money; and that the subjects are not included in the title, to wit:

"An Act to punish the making or use of false statements to obtain property or credit";

Second, "That the evidence is insufficient to sustain a verdict of guilty".

The statute under which defendant was charged is Oklahoma Statutes 1931, section 2102, O. S. A. (Stat. 1941), title 21, § 1501, and is as follows:

"Frauds In General

"§ 1501. Securing credit fraudulently—Penalty.— Any person who shall:

"1st. Knowingly make or cause to be made, either directly or indirectly or through any agency whatsoever, any false statement in writing, with intent that it shall be relied upon, respecting the financial condition, or means or ability to pay, of himself, or any other person, firm or corporation, in whom he is interested, or for whom he is acting, for the purpose of procuring in any form whatsoever, either the delivery of personal property, the payment of cash, the making of a loan or credit, the extension of a credit, the discount of an account receivable, or the making, acceptance, discount, sale or indorsement of a bill of exchange, or promissory note, for the benefit of either himself or of such person, firm or corporation; * * * shall be deemed guilty of a misdemeanor and punished by imprisonment for not more than six months or by a fine of not more than five hundred dollars, or both such fine and imprisonment."

We shall first consider the second assignment of error, which is the most important and presents the question as to whether the judgment and sentence can be sustained under the information filed, in view of the evidence submitted on the part of the state to prove the offense of which the defendant stands convicted.

The facts as revealed by the record are that the defendant was charged under the statute above quoted with

the crime of "securing credit fraudulently". It was alleged in the information that the defendant "wilfully, unlawfully and wrongfully obtained from W. W. Whiteman, Jr., seventy-five dollars good and lawful money of the United States of America, etc." The evidence of the state was that W. W. Whiteman, Jr., was the business manager of The Purchasers' Service Company, which was a corporation organized for the purpose of making loans to parties who were in debt and needed money to meet their obligations. The business was somewhat unique, as stated by Mr. Whiteman. He termed it the making of "consolidated loans". One desiring its service made a written application and listed therein the debts which he desired to pay. If everything was regular and the loan was made, checks for the amount of each debt were made out, payable to the parties to whom the borrower owed money. Each of these parties was required to sign a note guaranteeing the payment of the amount of their bill, and in the event the same was not paid by the borrower they would be liable for the amount of their debt. The total amount borrowed would be divided into monthly payments and the borrower would make these payments, which included the fee for this service and certain interest charges. The borrower received no money or cash, but his debts were paid direct to his creditors by checks issued by the corporation. This was the procedure followed in this case.

In the instant case, the defendant, who was a Pullman porter, made a written application for a loan of $75 to pay certain indebtedness which was specified in the written application. There was a conflict in the testimony of Mr. Whiteman and the defendant as to whether two written applications were made or just one. However, both testified that the loan was at first turned down;

that it was afterward accepted and the loan made when, upon request of Mr. Whiteman, two personal cosigners were secured by defendant, who signed the note given in connection with the application. The written application has certain questions to be answered. It was made out by Mr. Whiteman and signed by the defendant. A part of the statement was as follows:

"Car payment:
| Balance $ | Payable to: · | No. |

"Bank Loan payments:
| Balance $ | Payable to: | No. |

"Other Contract payments:
| Balance $ | Payable to: | No". |

A few months after this loan was taken out defendant filed a petition in bankruptcy, with a total indebtedness of $710.53, and among them as an indebtedness on a car which defendant had bought. Much of it was old indebtedness which was not pressing for collection.

There is a conflict between the evidence of the prosecuting witness, Whiteman, and the defendant with reference to the conversation between them at the time the loan was taken out. Mr. Whiteman testified that he understood by the written statement that it contained all of defendant's indebtedness, but he would not testify that defendant told him it was all of his indebtedness. On the other hand, defendant testified that he told Mr. Whiteman of the automobile indebtedness and Mr. Whiteman told him he could not take that up and that it would be best not to mention it in the statement, as he could not get the loan by his board if he did so. The testimony of Mr. Whiteman on this point was as follows:

"Q. And discussing this statement with him, did you ask him or question him about any debts or obligations he had at that time? A. Yes, sir. Q. And did he tell you about that? A. Well, you see listed on the applica-

tion there the ones he told me about. This is in my handwriting. Q. As he told you those, did you list them here? A. Yes, sir. Q. What did he tell you? A. We have a series of questions there on that blank— Mr. Archer: We will object to that on the ground it is not responsive to the question. The Court: The instrument will speak for itself, I take it. Mr. Daugherty: Yes, but I am not quite ready to introduce it. Q. Did he tell you that the obligations listed on this application for a loan were the only obligations he had at that time? Mr. Archer: Objected to on the ground it is leading. The Court: What did he tell you about it? I think that would be better form. Q. Yes, what did he tell you about these obligations and debts? A. It was my understanding that was his total debt. Mr. Archer: We object to his understanding. Q. Just tell what he told you? A. He told me those were the bills he owed. * * * Q. All right, at the time Frank Oliver signed that, he never told you at any one time that was all he owed, did he? A. That was my understanding. Q. I said, he didn't tell you that, did he? A. I can't remember the exact words Mr. Oliver said. Q. You testified just a few moments ago when the county attorney asked you if Mr. Oliver told you that, you said that Mr. Oliver said he owed these. A. That's right. Q. But he didn't say he didn't owe anything else, now, did he, Mr. Whiteman? A. Well, we had some other questions there that he answered 'no'. I see, did you have any payment on furniture, and the answer is no, and bank loans, no, and so on. Q. Did he tell you that he didn't owe anything else? Mr. Daugherty: Object to that because the instrument itself shows that. Q. All right, we will let the instrument speak. The Court: I take it from that instrument which has been introduced in evidence that all the questions that were propounded to him at the time are answered on that questionnaire. Is that correct, Mr. Whiteman? A. There might have been some collateral talk, but we do have specific questions that we ask; yes, sir. Q. (Mr. Archer) All right, Mr. Whiteman, is there any place on there that shows that there was no other obligations owed by him other

than the amount listed right here? A. No, sir. Q. Then he never represented to you in this instrument or anywhere that there was no other obligations? A. Well, when he answered the questions, was there any car payments? Q. Answer yes or no. A. You can't answer yes or no, Mr. Archer. Q. This is the complete list of indebtedness and amounts included in the application? A. Here is the statement of the monthly expenses. Do you have any furniture payment? no. Car payment, no. Bank loans, no. Q. Bank loans? A. And some of the record will show that at the time he did have those obligations that he was making payments on. Q. Did he tell you he didn't owe anything? A. He told me he was not making those payments. Q. That might be so, but did he tell you that he owed anything else, or did he tell you he didn't owe anything? A. Which do you mean, Mr. Archer? Q. Did Frank Oliver tell you that he didn't owe anything other than what he listed there? A. As a general statement; no, sir. Q. All right; that's all."

It is unnecessary to quote further from the evidence on this point. We have read it carefully. It reveals from beginning to end an attempt to collect a debt from defendant and, after exhaustion of that, a prosecution was instituted against this defendant as above outlined. Mr. Whiteman would not testify that defendant told him that the written application contained all of his indebtedness.

The statute above quoted and under which defendant was charged is similar to our statute of obtaining money or property under false pretense, Oklahoma Statutes 1931, section 2086, O. S. A. (Stat. 1941), title 21, § 1541, although it is not exactly like it. In the early case of Taylor v. Territory, 2 Okla. Cr. 1, 99 P. 628, 629, Judge Doyle, in an opinion construing that statute on false pretense, said:

"To constitute the crime under our statute, three things are essential: First, a false representation as to an existing fact; Second, a reliance on that representa-

tion as true; and, third, it must be the moving cause which induced the owner to part with his property."

We see no reason why the above principles should not apply to the statute here under consideration. If the agent of the loan company required the defendant to secure two personal cosigners on the note, after first turning down the application, and then making the loan after two cosigners were secured, it is certainly reasonable to believe that he relied upon the cosigners, and not upon the written statement, and that these cosigners were the "moving cause which induced the owner to part with his property."

The testimony of Mr. Whiteman with reference to this was as follows:

"Q. Have you got your records here on that? A. No, sir. Here is what happened in this case. When the application was originally submitted to me, we rejected it and then Frank came back and talked to me about it later on the basis of the same application. He provided a couple of individual cosigners, and that is the reason we decided to take the loan after the original rejection. Q. What caused the rejection of his application? A. Well, a couple of creditors there were not merchants, and ordinarily we insist on a merchant's endorsement. One was Daisy Garry, and one was Mrs. Stella Jones, I believe. Q. They were not what? A. They were not merchants. Q. And you like to have those that you take in on this to be merchants? A. Yes, sir; we usually take merchant endorsements. Q. And so for that reason you had him get some cosigners on the note? A. Yes, sir; that's correct. Q. There were no moneys paid Frank Oliver? A. Only these checks."

From what has been stated we have come to the conclusion that the evidence offered by the state is insufficient to sustain the charge in the information. It, therefore, becomes unnecessary to consider the other questions raised by the defendant as to the failure to sustain the

amended demurrer to the information and the constitutionality of the statute.

The judgment and sentence of the court of common pleas of Oklahoma county is reversed, with the directions to discharge the defendant unless the county attorney has sufficient evidence upon which to base another trial of this defendant.

DOYLE and JONES, JJ., concur.